IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Michael D. Wood,                                   (Chapter 7)

            Debtor.                         Case No. 12-13442

CONDON OIL COMPANY

            Plaintiff,
v.                                   Adv. No. 12-00181

MICHAEL D. WOOD,

            Defendant.

**MEMORANDUM DECISION**

From April 2009 through January 2012, Wisconsin Street Enterprises, Inc. ("WSE") operated two gas stations in Portage, Wisconsin. Michael D. Wood, the defendant debtor, was president and part owner of WSE. Condon Oil Company, the plaintiff, sold WSE motor vehicle fuel. In a sales agreement dated March 26, 2009, WSE agreed to purchase gasoline and diesel fuel for its gas station located at 2211 West Wisconsin Street, Portage, WI (the "Wisconsin Street Sales Agreement"). In a later agreement, WSE agreed to purchase gasoline and diesel fuel for its gas station located at 2725 New Pinery Road, Portage, WI (the "New Pinery Sales Agreement"). The agreements branded the stations as ExxonMobil stations and stated that WSE would provide banking and routing numbers to Condon so electronic fund transfer ("EFT") payments could be debited from WSE's account. They also required that the point-of-sale ("POS") equipment ("card readers") route all debit and credit card payments to Condon.

1

The debtor guaranteed all indebtedness of WSE to Condon in an agreement dated March 12, 2009. A year later, on March 18, 2010, the debtor signed a security agreement granting Condon a security interest in the gas pumps and POS equipment at both stations in order to obtain the release of certain rebates from ExxonMobil that Condon was holding in escrow. However, while WSE owned the designated collateral at the New Pinery Road location, another entity, Wisconsin Street Properties, owned the collateral at the Wisconsin Street location. The debtor mistakenly believed that WSE owned the equipment at both stations.

The debtor managed and operated both gas stations. He would identify the type and quantity of fuel the station required and place an order with Klemm Tank Lines ("Klemm"). In October 2011, WSE was struggling to maintain its cash flow. Because Condon could directly debit WSE's main bank account, the debtor opened a bank account at another bank for employee wages to ensure that employees would be paid each month. Then in January 2012, the business unraveled. The debtor began placing partial load order for fuel in order to maintain minimum fuel capacity. He was hoping to wind up the Wisconsin Street location and keep the New Pinery Road location open, but it became clear that both locations would have to shut down. Beginning January 6, 2012, Condon's EFT drafts of WSE's main bank account, to pay for fuel orders, bounced for insufficient funds. Between January 6-11, 2012, five attempted EFT drafts bounced. WSE did not pay for fuel orders delivered January 4-8, 2012. Additionally, the debtor placed handwritten signs over the credit card readers that said the business had been sold (even though it had not) and therefore only cash and check would be accepted for payment. Many customers would drive up, see the signs, and drive away. Customers who did purchase fuel were unable to make purchases with their credit cards. The credit card reports show a dramatic drop in credit

2

card sales as a result of the signs placed over the card readers. For one location, the drop occured on January 6, and for the other location, the drop occured on January 11.

Condon argues that the debtor is personally liable for the amounts owed by WSE to Condon and that debt is nondischargeable in bankruptcy. And, Condon seeks a judgment for the nondischargeable debt.

By dint of the United States Supreme Court in *Stern v. Marshall*, this court recognizes its lack of constitutional jurisdiction to enter a money judgment for a debt that is determined to be nondischargeable. *Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011) *reh'g denied*, 132 S. Ct. 56, 180 L. Ed. 2d 924 (U.S. 2011). Prior to *Stern*, it was a common practice for bankruptcy courts in the Seventh Circuit to adjudicate the issues of liability and damages along with dischargeability. *See In re Hallahan*, 936 F.2d 1496, 1508 (7th Cir. 1991). Under the reasoning in *Stern*, this practice must be discontinued.

The Supreme Court in *Stern* reasoned that where a claim is founded on a "state law action independent of the federal bankruptcy law," based on private rather than public rights, and "not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," it cannot be finally determined by an Article I bankruptcy judge.

Some bankruptcy courts have concluded that *Stern* does not affect a bankruptcy court's authority to enter a final judgment on liability and damages in a dischargeability proceeding. *See, e.g., In re Boricich*, 464 B.R. 335 (Bankr. N.D. Ill. 2011) (in which Judge Schmetterer held that it is necessary to determine the amount of debt in order to determine the debt that is nondischargeable). But the amount of the debt is patently unnecessary to a determination that it is nondischargeable. As Douglas Baird explains in *Blue Collar Constitutional Law*, the Supreme Court in *Stern* "distinguishes between administering the bankruptcy estate on the one hand and

3

engaging in actions that are the province of a common law judge on the other." Douglas G. Baird, *Blue Collar Constitutional Law*, 86 Am. Bankr. L.J. 3, 4-5 (2012). A debt need not be reduced to judgment in order for the court to determine whether that debt is nondischargeable. *Johnson v. Weihert (In re Weihert)*, 489 B.R. 558, 564 (Bankr. W.D. Wis. 2013). Once a debt is rendered nondischargeable, it becomes an ordinary debt, and entering judgment on such a debt is an exercise of federal judicial power:

> Obtaining a judgment is the way that one private citizen can call upon the state to use force against another citizen to vindicate her rights. Authorizing the forcible seizure of property is a serious business. It is the essence of the judicial power. Because the bankruptcy judge is not an Article III judge, she lacks the power to authorize one citizen to take property away from another. It is just as if a janitor at the courthouse entered the judgment. He does not possess the judicial power either. If you want authorization to take someone else's property in the federal judicial system on account of an ordinary debt, you need to get it from an Article III judge.

Baird, 86 Am. Bankr. L.J. at 5-6 (footnote omitted). Therefore, since liquidating a nondischargeable debt is not necessary to administer the bankruptcy estate, and entering judgment is an exercise of judicial power, a bankruptcy judge lacks the constitutional authority to reduce a nondischargeable debt to judgment.

Section 523 of the Bankruptcy Code provides the list of debts that are excepted from a debtor's discharge in bankruptcy. 11 U.S.C. § 523. Exceptions to discharge "are to be construed strictly against the creditor and liberally in favor of the debtor." *In re Slaton*, 469 B.R. 814, 819 (Bankr. W.D. Wis. 2012) (Judge Utschig) (citing *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998)). The creditor bears the burden of establishing non-dischargeability by a preponderance of the evidence. *Slaton*, 469 B.R. at 819 (citing *Grogan v. Garner*, 498 U.S. 279, 287–88 (1991)).

1. *Condon's § 523(a)(2) claim fails.*

Under Section 523(a)(2), a debt is nondischargeable to the extent it was "obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting

4

the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). In order to except a debt from discharge under § 523(a)(2)(A), a creditor "must establish the following elements: (i) that the debtor made a false representation of fact, (ii) that the debtor either knew the representation was false or made the representation with reckless disregard for its truth, (iii) that the representation was made with an intent to deceive, and (iv) that the plaintiff justifiably relied upon the false representation to its detriment." *In re Graham*, 472 B.R. 524, 529 (Bankr. W.D. Wis. 2012) (citing *In re Neale,* 440 B.R. 510, 521 (Bankr. W.D. Wis. 2010)). To succeed under this section, "all three ingredients are needed—falsity, fraudulent intent, and reliance." *Graham*, 472 B.R. at 529 (citing *In re Wyss,* 355 B.R. 130, 133 (Bankr. W.D. Wis. 2006)). In this case, Condon argues that the debtor committed fraud by failing to inform Condon about the new bank account, failing to alert Condon to the insufficient funds at the main account, and signing the security agreement for the gas pumps and POS equipment at the Wisconsin Street location.

The failure to alert Condon to the existence of the new bank account does not rise to the level of fraud. Condon argues that the debtor violated an obligation under the contract to inform Condon about WSE's bank accounts so that Condon could obtain payment for fuel orders through EFT drafts. However, a breach of a contract by itself will not render a debt nondischargeable under § 523(a)(2)(A). *Graham*, 472 B.R. at 529 (citing *In re Lee*, 415 B.R. 367, 372 (Bankr. E.D. Wis. 2009)). In this case, the separate bank account was created in October 2011. The debtor credibly testified that the new account was created to ensure that employees were paid first. Condon's EFT drafts were not predictable, and because cash flow was tight, the debtor sought to ensure that employee paychecks would always be honored. For the first few months, the account was used for that purpose. Even though money was ultimately used for other purposes in January 2012 when the business was unraveling, the debtor did not have the

5

requisite fraudulent intent at the time that the account was opened. The account was opened to ensure that employees were paid on time, not to prevent Condon from obtaining payment.

The failure to alert Condon to the insufficient funds also does not rise to the level of fraud. Condon argues that it was a deliberately misleading omission, because Condon sent the debtor notices of the upcoming EFT drafts. The most common type of fraud "involves a deliberate misrepresentation or a deliberately misleading omission." *Slaton*, 469 B.R. at 819 (citing *McClellan*, 217 F.3d at 892). However, a bad check has been held not to be a misrepresentation, because a check is not a representation. *In re Trevisan*, 300 B.R. 708, 716 (Bankr. E.D. Wis. 2003) (Judge Kelley) (citing *Williams v. U.S.*, 458 U.S. 279, 285–86, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982); *In re Scarlata*, 979 F.2d 521, 525 (7th Cir. 1992); *U.S. v. Doherty*, 969 F.2d 425, 427 (7th Cir. 1992). In an insufficient funds check case, the plaintiff must prove that the debtor made an express representation that the check was good, other than the issued check itself. *In re Barsamian*, 318 B.R. 508, 510-11 (Bankr. W.D. Wis. 2004) (citing *Trevisan*, 300 B.R. at 717). Correspondingly, a failure to respond to an EFT notice is not a misleading omission, unless the debtor had made an express representation that the EFT draft would go through. There is no allegation here that the debtor made such an express representation and the failure to respond to the EFT draft notices on its own was not fraudulent.

Finally, signing the security agreement for the gas pumps and POS equipment at the Wisconsin Street location on behalf of WSE when WSE did not own the property does not rise to the level of fraud in this case. The debtor signed the agreement in exchange for receiving rebates that had been escrowed. The rebates came from ExxonMobil. Condon required security before releasing the rebates because it would owe the rebates back to ExxonMobil if the business did not stay open a certain number of years. However, while the debtor did make a false

6

representation of fact regarding the ownership of the property, Condon failed to prove that the debtor knew the representation was false and had an intent to deceive. The debtor credibly testified at trial that he believed WSE owned the property. WSE did own the gas pumps and POS equipment at the New Pinery Road location, but not the Wisconsin Street location. Due to his partial ownership of both Wisconsin Street entities and the overlap of their business transactions, the debtor had mistakenly believed that WSE owned the gas pumps and POS equipment at both locations. Since the debtor sincerely believed that WSE owned the property, he had no fraudulent intent in signing the security agreement.

2) *Condon's § 523(a)(4) claim fails.*

Under Section 523(a)(4), a debtor may not discharge a debt incurred as a result of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). "Embezzlement" is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Matter of Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (citing *Moore v. United States,* 160 U.S. 268, 269, (1895)). To prove embezzlement, the creditor must show that "(1) the debtor appropriated funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit." *Weber*, 892 F.2d at 538-39 (internal citations omitted); *In re Neale*, 440 B.R. 510, 520 (Bankr. W.D. Wis. 2010) (Judge Utschig). Embezzlement "exists where the original acquisition of the funds was lawful or consensual." *Neale*, 440 B.R. at 520. Larceny is proven for purposes of Section 523(a)(4) "if the debtor has wrongfully and with fraudulent intent taken property from its owner." *In re Rose,* 934 F.2d 901, 903 (7th Cir. 1991) (internal citations omitted); *see also, In re Moreno*, 414 B.R. 485, 491 (Bankr. W.D. Wis. 2009). Larceny requires "a showing of felonious intent at the time of the taking." *Neale*, 440 B.R. at 520.

7

In this case, Condon argues that the debtor embezzled or stole the fuel he ordered that was delivered January 4-8, 2012, and never paid for. Ordering and receiving the fuel cannot constitute larceny because the acquisition of the fuel was both lawful and consensual. Additionally, it does not raise the level of embezzlement in this case because Condon failed to prove fraudulent intent. At the time of these orders, the debtor placed partial load orders for the fuel, thereby limiting the amount of fuel ordered to a minimum. If the debtor intended to appropriate the fuel for his own benefit at that time, there would have been no reason to place smaller orders. Failure to subsequently pay for the fuel was a breach of contract, but not embezzlement of the fuel or the proceeds.

*3) Condon's § 523(a)(6) claim succeeds.*

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The plaintiff must establish that: (1) the debtor intended to and caused an injury to the creditor's property interest; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious. *In re Williams*, 478 B.R. 362, 365 (Bankr. E.D. Wis. 2012). "Injuries that are recklessly or negligently inflicted do not fall within the scope of [Section 523(a)(6)]." *Slaton*, 469 B.R. at 821 (internal citation omitted). The "facts must demonstrate that the [debtors] deliberately intended the harmful consequences of their actions in order for it to be 'willful.'" *Id.* "An act is 'malicious' if it is done in 'conscious disregard' of one's duties or without just cause or excuse." *Id.* (citing *In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994)). The Seventh Circuit Court of Appeals has explained that despite semantic confusion over the standard, "we imagine that all courts would agree that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had no

8

legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa–Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012); *In re Weihert*, 489 B.R. 558, 566 (Bankr. W.D. Wis. 2013).

In this case, Condon argues that the signs taped over the credit card readers were a willful and malicious injury. The debtor admitted to taping the signs over the credit card readers at the gas pumps. The signs prevented customers from using their credit cards to purchase gasoline. The credit card reports show that credit card sales plummeted due to the signs. Under the sales agreements, proceeds from credit card sales went directly to Condon. The debtor intended to place the signs over the card readers in violation of his duties under the contract and intended that Condon would be deprived of the proceeds from credit card sales. The credit card reports show that credit card sales virtually ceased after the debtor taped up the signs, and therefore Condon was injured as a result of the debtor's actions. This constitutes a willful and malicious injury for purposes of § 523(a)(6).

To the extent of the debtor's liability for injury to Condon as a result of the signs being taped over the credit card readers, the debt is nondischargeable in bankruptcy. To the extent of the debtor's liability arising from other actions, the debt is discharged. It may be so ordered.

Dated: August 19, 2013

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE

9